Collier *v.* Pfenning.

## MICHAEL COLLIER

*v.*

## CHARLES PFENNING et ux.

In 1860, complainant made a verbal agreement with his brother John to buy a part of a tract of land on which John then lived. He paid the purchase-money, entered into possession, and erected thereon a dwelling-house, in which he has ever since resided. John continued to live on the other part of the land. In 1873, John gave three mortgages covering the entire tract. In 1877, the first mortgage was foreclosed, and the whole tract bought thereunder by the holder of the other two mortgages. In 1875, complainant had a survey of his part of the tract made, and also a search of the records, whereby he discovered the existence of the mortgages; he also knew of the subsequent advertisement of the premises for sale under the foreclosure, and consulted counsel in regard to it, but took no steps to protect his claim, not even giving notice of it at the sheriff's sale.—*Held*, that his silence estopped him from setting up any claim to relief against the purchaser at the foreclosure sale.

Bill for specific performance. On final hearing on pleadings and proofs, and briefs of counsel.

*Mr. A. T. McGill,* for complainant.

*Mr. John Linn,* for defendants.

THE CHANCELLOR.

The bill is filed to compel specific performance by the defendants, of a parol agreement, made by John Collier with the complainant, his brother, in 1860, for the sale of a lot of land containing an acre and a half. The defendant Charles Pfenning purchased the land in question at sheriff's sale, March 7th, 1877. It appears by the bill that in September, 1860, the complainant made a verbal agreement with his brother John, to buy of the latter, for the consideration of $400, the land in question, which was part of a lot of six acres then owned by John; that he paid

Collier *v.* Pfenning.

the purchase-money, entered at once into the possession of the land and improved it, building upon it a small dwelling-house, in which he has ever since resided. John lived upon the other part of the property. The complainant alleges that he never received any deed for the property. In 1873, John borrowed from Andrew Hoffman $3,000 on a mortgage of the whole property, and of Paul Heerbrant, on like mortgages, two sums of $1,000 and $500. The Heerbrant mortgages were in the same year assigned to the defendant Pfenning for the full amount due thereon. Subsequently, and about the year 1877, Hoffman brought a suit in this court to foreclose his mortgage, making Pfenning, as the holder of the other two mortgages, a party thereto. The complainant Michael Collier was not a party, but his brother John was. That suit resulted in a decree for foreclosure and a sale of the premises under the execution issued, upon which Pfenning became, by purchase at the sheriff's sale, the owner of the property at the price of $3,950. It appears by the evidence that in 1875 Michael first learned that his brother John had mortgaged the whole property by the mortgages before mentioned. He learned this through a search of the records which he then caused to be made by a surveyor, whom he employed to survey his property, and draw the deed therefor from John to him. It seems quite probable, from the testimony of Williams, the surveyor, that the deed was in fact drawn and executed at that time. The complainant rests his claim to relief in this suit, upon the principle that possession of land is notice to others of the possessor's title. But as was said in *Groton Savings Bank* v. *Batty, 3 Stew. Eq. 126–131,* that principle is intended for a shield to protect the equitable rights of those who are entitled to the consideration of equity. It will not be available as a cover for fraud, nor will it be applied against equity.

" It may reasonably be questioned," says the chief-justice, in *Lathrop* v. *Groton Bank, 4 Stew. Eq. 273,* " whether, in many cases, the rule that the possession of lands being in a stranger to the documentary and record title, makes it unsafe to trust to such title with implicitness, has not been pushed to an extreme, so as to produce inequitable results ; and it certainly seems necessary, if the rule is to retain a leaven of justice, to annex to it the qualification that

Collier *v.* Pfenning.

the occupier of the property should be required to refrain from doing any thing having an illusive tendency with respect to the ownership."

In that case the defence set up was, that although the absolute title to the mortgaged premises was vested in the mortgagors when the mortgages were given, and although such was the title as it appeared upon the record in the clerk's office, yet, notwithstanding that, the real owner in equity was the defendant Mrs. Lathrop, and as she was openly in the possession and enjoyment of the property, both when those encumbrances were executed and for a long time previously, the bank (the complainant) from that fact was put upon inquiry, and if it had discharged that duty, it would have discovered that its mortgagors were mere trustees, having no right to execute those instruments or either of them. The defendant Mrs. Lathrop was held to be estopped, by her silence and acquiescence, from invoking the aid of the before-mentioned principle. After the first mortgage on the property had been given, she became aware that it had been executed, and she did not, between that time and the time when the second one was given (which was to the same parties), notify the bank of the existence of her title. In the case in hand, it appears that the complainant knew of the existence of the decree for foreclosure and sale of the whole property for three or four months, at least, before the sale took place. He testifies that he knew that the property was advertised for sale by the sheriff, and that he consulted counsel in reference to the matter, about three or four months before the sale. He did not attend the sale, however, nor did he give any notice to Pfenning, nor to any one else interested in the sale, of his claim of title. He, indeed, swears that Pfenning told him, before the latter bought the property— and he thinks it was in 1876—that he held a mortgage or mortgages on the property. He narrates the circumstances as follows:

"He came up to me one Sunday in the winter-time; there was snow outdoors; he came in and spoke to me, and talked about his having a mortgage on the property; I told him I didn't know anything about it; I didn't give any mortgage on the property; then he went on and told me how he got it."

Collier *v.* Pfenning.

He further says—

"I told him it was my property, and he knew it was my property, too."

It appears conclusively from the testimony that this statement is entirely unworthy of credit, and that Pfenning never saw him until after the sale had taken place. Michael's son Andrew is the only other witness on the subject of notice to Pfenning, but it appears by his own testimony that he went to Pfenning for the purpose of endeavoring to purchase his mortgages from him at a low price. He not only did not inform Pfenning who he was, or of his relationship to the complainant, but, on the other hand, studiously concealed it, giving Pfenning to understand that he was a real estate dealer of the city of New York. Pfenning and two other witnesses, who were present at the conversation, all testify that nothing was said in it by Andrew, on the subject of the claim of ownership of the complainant to any part of the mortgaged premises; and Andrew's statement itself, in the light of his cross-examination, is unworthy of confidence. The complainant, then, with a full knowledge of his rights—for as before stated he had consulted counsel on the subject—permitted the sheriff's sale to take place, without notifying those who proposed to purchase the property at that sale, that he was the owner of any part of it. Under the circumstances, he must be held to be estopped by his silence, from setting up his claim to relief against the purchaser, who, it may be stated, was compelled to pay out of the purchase-money ($3,900) the Hoffman mortgage of $3,000, with interest and costs.

The bill will be dismissed, with costs.